**UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF NEW JERSEY**
**NEWARK DIVISION**

**CASE No. ____________________**

**LUCREZIA PRESTA,** individually, and
**PRESTA IRA LLC**, individually,
and on behalf of all others similarly situated,

Plaintiffs,

v.

**BROAD FINANCIAL, LLC,** a New Jersey limited liability company,

Defendant.
________________________________________/

**CLASS ACTION COMPLAINT AND JURY DEMAND**

Plaintiffs Lucrezia Presta ("Ms. Presta") and Presta IRA LLC (together, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through undersigned counsel, hereby sue Broad Financial, LLC ("Broad Financial") and allege as follows:

**NATURE OF THE ACTION**

1. A lifetime of retirement savings lost. Ms. Presta, a schoolteacher of 24 years, saved for more than two decades and lost it all because she trusted self-touted "crypto sanctuary," Broad Financial. The vehicle Broad Financial built to receive her savings—the LLC it created, governed with documents it drafted, and sent directly into Goliath's scheme—suffered those same losses as its own direct injury.

2. This case is about the age-old scheme of "robbing Peter to pay Paul" with a new twist out of the cryptocurrency era: a purported "cryptocurrency liquidity pool" program that was marketed as sophisticated, low-risk, and income-generating—but that federal law enforcement

now alleges comprised a no-less-than $328 million Ponzi scheme. Goliath Ventures, Inc. ("Goliath") told investors—through written "Joint Venture Agreements" and accompanying marketing materials—that investor funds would be deployed into DeFi liquidity pools (frequently referencing Uniswap and USDC pairings) and that investors would receive predictable monthly returns—sometimes presented as guaranteed or low-risk. But the United States Department of Justice has publicly announced that Goliath's CEO, Christopher Delgado, has been arrested for wire fraud and money laundering arising out of an alleged Ponzi scheme in which investor funds were not, in any meaningful way, deployed into liquidity pools; instead, the money was allegedly used to pay purported returns to earlier investors, return principal to select investors to maintain confidence, and fund personal expenditures. Goliath marketed fixed monthly returns that were mathematically incompatible with liquidity-pool yield generation.

3. Unfortunately, the scheme did not simply prey on discretionary savings; it preyed on the retirement accounts of the most vulnerable—IRAs that ordinary people believed were being handled through professional IRA-LLC facilitators.

4. For Plaintiffs and the putative Class who suffered the same fate, Broad Financial was not a sanctuary at all, but instead, was the steering wheel for a crypto Ponzi Scheme—guiding investors towards financial ruin without regard to Broad Financials' own representations, its duties, or the law. Broad Financial was the "gatekeeper" and facilitator who built and profited from the pipeline that made it easy—and fast—for retirement funds to be converted into fuel for Goliath's Ponzi scheme. Through Broad Financial's pipeline, retirement investors could rapidly move IRA funds to an IRA-owned LLC and then, with minimal friction, wire or transfer those retirement funds into Goliath's Ponzi scheme. Broad Financial processed a concentrated stream of investors

referred by Goliath promoters who were all directed to invest in the same purported joint venture structure using identical offering materials and substantially identical transaction mechanics.

5. Ms. Presta is not alone. Broad Financial processed at least dozens of Goliath-referred investors through the same intake, charged them the same fees, handed them the same defective documents, and sent them down the same path to financial ruin, all while collecting its fee and calling itself a sanctuary. This case is about holding Broad Financial accountable for what it actually did: not the passive failure of a middleman who missed a red flag, but the active participation of a company that built, legitimized, and profited from a $328 million fraud.

**PARTIES, JURISDICTION, AND VENUE**

6. Plaintiff Lucrezia Presta is an individual residing in North Carolina. At all relevant times, Ms. Presta was the IRA owner, sole member, and manager of the Presta IRA LLC, and the sole beneficial owner of all assets held or invested through the Presta IRA LLC.

7. Plaintiff Presta IRA LLC is a limited liability company formed with the assistance of Broad Financial for the specific purpose of serving as the checkbook-control vehicle for Ms. Presta's Self-Directed IRA ("SDIRA"). The Presta IRA LLC was organized under the laws of North Carolina. The Presta IRA LLC was not formed voluntarily by Ms. Presta through independent counsel; it was created, named, organized, and governed entirely through documents drafted and supplied by Broad Financial as part of the services at issue in this action. The Presta IRA LLC held the retirement assets at issue, executed or was used to execute the Goliath investment, and suffered direct injury as a result of Broad Financial's conduct.

8. Defendant Broad Financial is a limited liability company organized under the laws of the State of New Jersey with its principal place of business located at One Paragon Drive, Suite 270, Montvale, New Jersey 07645. Upon information and belief, Broad Financial conducts

substantial business throughout the United States, including the marketing and sale of SDIRA and "checkbook control" retirement account structures to consumers seeking to invest retirement funds in alternative assets, including cryptocurrency investments. Plaintiffs do not know the members of the Broad Financial LLC but believe that E. Brian Finkelstein is a member of the LLC, and also serves as the Chairman of the company resides and is a citizen of either the states of New Jersey or New York and not in the state of the Plaintiffs' residences. Mr. E. Brian Finkelstein is also the Chairman of Broad Financial LLC's sister company, Madison Trust, a company registered as a Self Directed IRA Custodian with the IRS. Upon information and belief, Broad Financial LLC is not registered with the IRS as an IRA Custodian.

9. This Court has subject-matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because this action is brought as a class action in which the matter in controversy exceeds $5,000,000, exclusive of interest and costs, the proposed Class consists of more than 100 members, and at least one member of the proposed Class is a citizen of a state different from Defendant.

10. This Court also has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between the parties. Plaintiff Lucrezia Presta is a citizen of North Carolina. Plaintiff Presta IRA LLC is a citizen of North Carolina. Defendant Broad Financial, LLC is a citizen of New Jersey, as its sole state of organization and the state in which its principal place of business is located. No member of Broad Financial, LLC is a citizen of North Carolina.

11. Personal jurisdiction exists because Broad Financial is headquartered in Bergen County, New Jersey, conducts substantial business within New Jersey, and conduct giving rise to

Plaintiff's claims was directed from and carried out by Broad Financial personnel operating from New Jersey.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant resides and/or operates in this District and a substantial part of the events or omissions giving rise to the claims occurred within this District.

13. New Jersey law, including the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq., governs the claims of all Plaintiffs and Class members. All conduct giving rise to Plaintiffs' claims — including Broad Financial's marketing of its SDIRA and checkbook-control services, its onboarding and intake processes, its referral arrangements with Goliath affiliates, its evaluation or deliberate non-evaluation of investors' contemplated investments, its preparation and supply of operating agreements and other governing documents, and its instructions to investors regarding the transfer of retirement funds into the Broad Financial-created structure—was conceived, directed, and executed by Broad Financial from its principal place of business in Montvale, New Jersey. The wrongful conduct at issue was not merely felt in New Jersey; it originated entirely in New Jersey and was transmitted outward to investors across the country. Under New Jersey's choice-of-law rules and the Restatement (Second) of Conflicts § 148, where the defendant's conduct causing injury is centered in a single state, that state's law applies to the claims of all plaintiffs regardless of their domicile. New Jersey has a compelling interest in deterring and remedying deceptive and unlawful conduct by companies that operate from within its borders and use that base of operations to harm consumers nationwide.

## FACTS

### I. The $328 Million Goliath Ventures Ponzi Scheme

14. This case arises from the collapse of an investment scheme marketed as a cryptocurrency "liquidity pool" joint venture—an arrangement pitched to ordinary people (often retirees) as a safe, steady, high-yield vehicle that could be funded through SDIRAs.

15. A "liquidity pool" is commonly described as a pool of digital assets locked into a software-based mechanism that allows trading on decentralized exchanges (including by pairing assets such as stablecoins and cryptocurrencies). In theory, liquidity providers may earn fees tied to trading volume. In reality, liquidity-pool returns are inherently variable and exposed to market volatility, counterparty risk, smart-contract risk, and severe loss events.

16. Goliath, however, generated very little, if any, fees from contributions to any liquidity pools. In reality, Goliath was a massive cryptocurrency Ponzi scheme orchestrated by its CEO Christopher Delgado ("Delgado"), and others working in concert.

17. What Plaintiffs and the Class were sold was not a liquidity-pool strategy—it was the illusion of one. And the scheme would not have reached so deeply into Americans' retirement savings without the infrastructure Broad Financial provided.

18. The scheme continued until the Department of Justice ("DOJ") arrested Delgado on February 24, 2026. Upon information and belief, the DOJ is presently pursuing a forfeiture claim against Delgado and is seizing all of his personal assets.

19. Part of Goliath's scheme was the implementation of a purported Goliath individual retirement account ("IRA"), whereby investors were induced to transfer their years-earned IRA balances to a SDIRA supposedly affiliated with Goliath, so that investors could invest those IRA

funds into Goliath's scheme. The Goliath Ventures investments were evidenced by a "Joint Venture Agreement" ("JVA") between the investor and Goliath Ventures.

20. The JVAs were not marketed on any national exchange, and were not registered nor exempt from registration, though they do constitute a "security" under federal and state securities laws. While the JVA parties are "partners" in the legal sense, the Goliath Ventures investment was operated by Goliath Ventures and the investors did not participate in the management of the investment. The investor partners were "silent partners", providing cash to the investment but not otherwise managing or control the decisions of the venture. The "economic reality" of the investment was that all investment decisions and management was solely controlled by Goliath Ventures, which entity is currently in receivership in Broward County, Florida.

## II. What is Broad Financial, LLC?

21. Broad Financial markets and sells SDIRA and checkbook-control setup services to consumers who sought to use retirement funds for specific alternative-asset investments.

22. They are, in a nutshell, a middleman that misrepresents itself as having expertise and offering advice they respectively do not have and cannot offer.

23. The SDIRA ecosystem can allow alternative investments. But it also creates a known and foreseeable vulnerability: it enables promoters to access retirement funds through "checkbook control" structures that can move money quickly.

24. In no uncertain terms, Broad Financial represents that they review and consider investments, and guide consumers to the right Broad Financial plan for the consumer's specific investment.

> We will guide you through the process of selecting from our variety of Self-Directed IRA services to pick the right plan for your investment and get everything up and running so you can start investing.

25. In fact, Broad Financial's public-facing onboarding is investment-specific. Its intake flow asks prospective customers, "What would you like to invest in?"

26. This makes sense. Because, of course, if Broad Financial did not review the investment it could not, as it purports to do, guide its clients to the "right plan."

27. Undoubtedly, Broad Financial will claim that it did not, in fact review the investment, which is equally problematic in light of Broad Financial's promise that it would "guide" Plaintiff and the Class to "pick the right plan for [their] investment."

## III. SDIRAs, Checkbook Control Structures, and the Role of Facilitators Like Broad Financial

28. A traditional Individual Retirement Account ("IRA") is a tax-advantaged retirement savings vehicle held by a custodian—typically a bank or brokerage—that limits investment options to conventional assets such as stocks, bonds, and mutual funds. The custodian serves as a check on the IRA owner's investment decisions, reviewing transactions, maintaining records, and helping ensure the IRA complies with applicable tax law.

29. A SDIRA is a variation of the traditional IRA that permits the account owner to invest in a broader range of "alternative assets," including real estate, private equity, precious metals, and cryptocurrency. Like a traditional IRA, an SDIRA must be held by a qualified custodian. Unlike a traditional IRA, the SDIRA custodian typically takes a passive role —it holds the assets and processes transactions as directed by the IRA owner but does not evaluate or approve the merits of the investments the owner chooses to make.

30. Because SDIRA custodians must sign off on each transaction, some investors seek an additional layer of structural control known as "checkbook control." In a checkbook control

arrangement, the SDIRA custodian contributes the IRA's funds into a limited liability company ("LLC:) that the IRA owns. The IRA owner is then named manager of the IRA-owned LLC. Because the IRA owner controls the LLC as its manager, the IRA owner can write checks or wire funds directly from the LLC's bank account to make investments—without requiring the custodian's involvement in each transaction. The structure looks like this:

IRA Owner (as Manager)
↓
SDIRA (held by Custodian)
↓
owns 100% IRA-Owned LLC
↓
Investments

31. The checkbook control structure offers legitimate advantages for experienced investors in appropriate circumstances—primarily speed of execution and reduced per-transaction custodian fees. But it also dramatically reduces custodian oversight, placing the full burden of legal and tax compliance on the IRA owner. Because the IRA owner is writing the checks directly, there is no custodian review to catch mistakes — or fraud.

32. The legal risks of a checkbook control structure are significant and well-documented. The IRA is a separate, tax-exempt entity. Federal law requires it to be treated as entirely distinct from the IRA owner's personal finances and business interests. The IRA owner is a fiduciary with respect to the IRA's assets—not an owner. The IRA owner cannot personally benefit from IRA assets, cannot use IRA property, cannot pay himself fees for managing the IRA's investments, and cannot transact with "disqualified persons," a defined category that includes the IRA owner, the owner's spouse, lineal descendants, and any entity in which the owner holds a controlling interest.

33. These restrictions are codified at 26 U.S.C. § 4975, which defines "prohibited transactions" and imposes severe consequences for violations. If an IRA owner engages in a prohibited transaction, the IRA ceases to be an IRA as of the first day of that taxable year — meaning the entire account balance is treated as distributed, triggering immediate income tax and, for owners under 59½, a 10% early withdrawal penalty. In other words, a single prohibited transaction can instantly convert a lifetime of tax-advantaged retirement savings into a fully taxable distribution.

34. One of the most common and most dangerous prohibited transaction traps in the checkbook control context involves partnership or joint venture investments in which the IRA owner holds a significant interest. Under § 4975(e)(2)(G), a partnership or joint venture in which the IRA owner—who is a fiduciary and therefore a "disqualified person"—owns 50% or more of the capital or profits interest is itself a disqualified person. Any transaction between the IRA and a disqualified person is prohibited. Accordingly, where an IRA owner causes the IRA-owned LLC to invest in a joint venture in which the owner holds a 50% or greater interest, the investment creates an automatic prohibited transaction, with potentially catastrophic tax consequences for the IRA owner.

35. Because of these risks, checkbook control structures are not appropriate for every investor or every investment. They require careful structuring, independent legal and tax advice, and rigorous ongoing compliance. The IRA owner must understand not only the mechanics of the LLC but the specific legal limitations on how IRA assets may be used—limitations that are technical, counterintuitive, and easy to violate without expert guidance.

36. This is precisely where companies like Broad Financial insert themselves into the market. Broad Financial calls itself a "facilitator": "As an IRA LLC Facilitator, Broad Financial

upgrades your Self-Directed IRA with the power of checkbook control." Broad Financial markets and sells the formation and setup of SDIRA/checkbook control structures to retail investors—people like Ms. Presta, who are not tax lawyers or securities professionals, who are entrusting their life savings to a structure they do not fully understand, and who are relying on Broad Financial's self-advertised expertise to guide them safely through it. As set forth below, Broad Financial exploited that reliance, collected its fees, and delivered not guidance but a ready-made vehicle for financial ruin.

## IV. Broad Financial "Broadens" the Goliath Ventures Ponzi Scheme and Plays Lawyer Along the Way

37. In its haste to generate fees, Broad Financial began working with promoters from Goliath seeking to exploit the life savings and livelihoods of working individuals like Ms. Presta. Upon information and belief, Broad employees communicated directly with promoters from Goliath Ventures. In broad terms, Broad Financial is a promoter, marketer and advisor on the structure and formation of Self Directed IRA investments and its sister company, Madison Trust, serves as the SDIRA Custodian. E. Brian Finkelstein is the Chairman of both companies, and both companies appear on their websites to have the same team of executives for both companies.

38. The Goliath promoters, who also stood to gain from Plaintiff's investment, sent dozens and dozens of unsuspecting individuals to Broad Financial all for the same purpose: to get the investor money into Goliath. Upon information and belief, Broad Financial maintained a referral fee program pursuant to which it paid approximately $200 per investor to promoters associated with Goliath Ventures in exchange for directing investors to Broad Financial to establish self-directed IRA and IRA-owned LLC structures. Through this arrangement, Broad Financial received a concentrated and repeated stream of Goliath-referred investors who were directed to participate in the same investment program using substantially identical transaction structures and

materials. This referral-fee arrangement created a direct financial incentive for Broad Financial to process such investors without regard to the legitimacy, suitability, or legality of the underlying investment. By compensating promoters for investor referrals, Broad Financial was not acting as a neutral service provider but as a participant in the investor-acquisition pipeline that enabled Goliath's scheme to access retirement funds. These payments further demonstrate that Broad Financial knew, or was willfully blind to the fact, that its services were being used in connection with a coordinated and repetitive investment program, and that it provided substantial assistance to that program by facilitating the formation and funding of investor accounts.

39. Broad Financial was more than happy to accept these referrals, fees, and instructions from these Goliath affiliates and in doing so abandoned its duties and responsibilities to its actual clients, the Plaintiff and others similarly situated. Broad Financial earned formation and service fees from each Goliath-referred investor, creating a direct financial incentive to process the investments without scrutiny.

40. Indeed, Broad Financial did not guide Plaintiff and the Class to the "the right plan for [their] investment." Broad Financial steered those poor people into Goliath's scheme—irrespective of whether there was a right plan to be had. Broad Financial marketed to Plaintiff, and the members of the putative Class, the "Ultimate IRA LLC®" product and provided a "binder" of entity formation documents and instructions for the IRA LLC.

41. More specifically, in 2025, Broad Financial "guided" Ms. Presta and the putative Class to its SDIRA Program.

42. In doing so, Broad Financial created (and charged to create) a limited liability company for Ms. Presta—Presta IRA LLC—which would serve as the checkbook-control entity through which her retirement funds would be invested. Shockingly too, though not a law firm,

Broad Financial drafted the operating agreement for the entity so that Ms. Presta could invest her retirement into a cryptocurrency Ponzi scheme.

43. This is problematic for several reasons outlined further below, including the fact that New Jersey Court Rule 1:21-1 provides that no person may practice law in New Jersey unless licensed. The New Jersey Unauthorized Practice of Law Committee has further stated that preparing operating agreements and similar legal documents is the practice of law and may only be performed by lawyers, while nonlawyers may not advise customers concerning the contents of formation documents.

44. New Jersey law provides that no person may practice law in the State unless licensed, that preparing operating agreements and similar legal documents is the practice of law, and that a person who suffers ascertainable loss from another's knowing unauthorized practice of law may bring a civil action for statutory and other relief.

45. Ms. Presta had no idea she was wiring funds to a Ponzi scheme, nor did she have any idea that Broad Financial was offering not only negligent or otherwise wrongful advice, but advice it was in-fact prohibited from providing.

46. Broad Financial uniformly represented to the public, including Plaintiff and the Class, that it was a "Crypto Sanctuary" and possessed "Alternative Asset Expertise." Through standardized website content and/or marketing materials, Broad Financial held itself out as having specialized knowledge and experience in alternative investments, including by stating: "Broad Financial Onboarding Specialists have experience with an extensive range of asset classes." These representations were material because a reasonable consumer would consider it important that the entity structuring retirement-account investments possessed expertise regarding those investments.

Broad Financial made these representations to induce consumers to rely on its purported expertise in selecting and structuring investment vehicles, and consumers did so on a classwide basis.

47. Before Broad Financial formed Plaintiff's IRA-owned entity and before Broad Financial drafted, supplied, or caused to be drafted the governing operating agreement for that entity, Broad Financial was informed, knew, should have known, and in either case, turned a blind eye to the fact that that the sole intended purpose of the structure was to invest retirement funds into a joint venture in which Plaintiff would hold a 50% partner or joint-venture interest and would exercise control over the enterprise.

48. Broad Financial represented that it would and in fact agreed to "guide" Plaintiff to the "right" retirement investment structure that best suited its investment. It did not.

49. Indeed, Broad Financial represented to consumers that it would help them "pick the right plan for your investment," would give an "honest opinion" whether the planned investment would work with the self-directed platform, would create the LLC with a "compliant operating agreement," and would establish the IRA LLC or trust and handle the paperwork.

50. Broad Financial knew, or in the exercise of reasonable care should have known, the identity and basic structure of the contemplated transaction before selling Plaintiff the Broad Financial-sponsored structure.

51. Broad Financial then formed or caused the formation of the IRA-owned LLC or trust.

52. Worse, Broad Financial prepared or supplied the operating agreement and related organizational papers and instructed Plaintiff how to proceed so that retirement funds could be moved into the Broad Financial-created structure.

53. Broad Financial thus did not act as a merely ministerial form vendor; it held itself out as providing investment-specific structural and legal guidance and document preparation for the very transaction Plaintiff disclosed.

54. Upon information and belief, Broad Financial processed a concentrated stream of investors referred by Goliath promoters who were directed to make the same or substantially similar investments using identical Joint Venture Agreements and transaction mechanics. The repeated onboarding of investors referred by the same promoters into the same investment program created an obvious pattern that Broad Financial saw and, upon information and belief, triggered scrutiny and compliance review, that should have lead to a refusal to facilitate the transactions.

## V. Broad Financial Was Not a Crypto Sanctuary; There Was no "Right" Plan to Invest Retirement Savings into Goliath

55. The IRS warns that prohibited transactions involve improper use of IRA assets by the owner, beneficiary, fiduciary, or other disqualified persons, and that if an IRA owner engages in a prohibited transaction the IRA can cease to be an IRA and be treated as distributed.

56. In addition, under 26 U.S.C. § 4975, an individual retirement account is a "plan," and the person who directs the IRA's investment decisions is a fiduciary and therefore a disqualified person.

57. The statute further provides that a prohibited transaction includes, among other things, any direct or indirect sale or exchange between the plan and a disqualified person, any transfer to or use of plan assets for the benefit of a disqualified person, and any act by which a fiduciary deals with plan assets in his own interest or for his own account.

58. The statute also provides that a partnership of which 50% or more of the capital or profits interest is owned directly or indirectly by a fiduciary is itself a disqualified person. If the

IRA owner engages in such a prohibited transaction, the IRA ceases to be an IRA as of the first day of that taxable year.

59. Accordingly, once Broad Financial knew (or should have known) that Plaintiff's contemplated investment would place Plaintiff in a 50% partner/control position in the joint venture, Broad Financial knew or should have known that the proposed transaction was not an appropriate or permissible use of the SDIRA structure Broad Financial was selling and, at minimum, presented an obvious prohibited-transaction and self-dealing problem under 26 U.S.C. §§ 4975(c)(1)(A), (D), and (E), 4975(e)(2)(G), and 408(e)(2)(A).

60. Nevertheless, Broad Financial steered Plaintiff to its SDIRA plan and prepared the documents "enabling" this cryptocurrency investment without regard to the law or the "right plan."

61. Instead of declining the matter, referring Plaintiff to a licensed attorney, or warning that the contemplated transaction was unsuitable or incompatible with the structure Broad Financial was selling, Broad Financial recommended and sold that structure for the identified investment.

62. The Department of Labor ("DOL") has recognized that an IRA's purchase of a partnership interest is not automatically prohibited on every set of facts, but only where the IRA owner held a small interest, received no compensation, and the arrangement did not create the kind of conflict or dependence condemned by the statute.

63. By contrast, DOL has explained that a prohibited transaction occurs where the fiduciary causes IRA assets to be used in a manner designed to benefit himself, where the transaction creates a conflict between the IRA and the fiduciary, or where the fiduciary depends on the IRA's participation; and on materially weaker facts, DOL concluded that self-dealing was likely even where the IRA owner held only a 46%–48% interest.

64. Here, Broad Financial knew, or most certainly should have known based upon its representation that its plan selection was based upon investment, that Plaintiff possessed 50% partner/control position placed the contemplated transaction well beyond the facts DOL found unobjectionable.

65. Broad Financial therefore should have refused to form the entity for that purpose, refused to draft or supply an operating agreement for that structure, and directed Plaintiff to obtain independent legal and tax advice before any retirement funds were transferred.

66. By instead creating the entity, drafting or supplying the operating agreement, and facilitating the transaction, Broad Financial enabled a structure that was facially prohibited or, at minimum, obviously incompatible with the compliance analysis Broad Financial represented it would perform.

67. This was especially true because, under New Jersey unauthorized practice guidance, preparing operating agreements and similar legal documents is the practice of law and may only be performed by lawyers, while nonlawyers may not advise customers as to the proper contents of formation documents.

68. Broad Financial's preparation or supply of the operating agreement for a structure Broad Financial knew was intended to place Plaintiff into a 50% partner/control joint venture required legal judgment about the contents and legal effect of the governing documents and about whether the contemplated transaction could properly be housed in an IRA-owned entity at all.

69. To the extent Broad Financial contends that a SDIRA may sometimes invest in a partnership or joint venture, that contention does not defeat Plaintiff's claim. Broad Financial's own representations were that it would determine whether Plaintiff's planned investment would work with the self-directed platform and would select the right plan for that investment. Faced

with a disclosed transaction in which Plaintiff would be a 50% partner with control—or, at minimum, a legally uncertain, conflict-laden, fact-intensive arrangement implicating §§ 4975(c)(1)(D) and (E)—Broad Financial could not truthfully represent that the structure it sold was the right plan, and it should not have drafted or supplied a purportedly "compliant" operating agreement without requiring independent legal review.

70. Regardless, the contemplated Goliath transaction was not the right plan for the retirement-account structure Broad Financial sold. At minimum, it was unsuitable or incompatible for the Broad Financial structure and exposed Plaintiff to serious prohibited-transaction and compliance risk because the transaction allegedly required Plaintiff to participate personally as a "partner" or joint venturer or otherwise outside the proper IRA structure.

71. Broad Financial marketed itself as possessing investment-specific expertise and as able to help consumers choose the proper self-directed retirement structure for a contemplated investment.

72. Plaintiff sought to use retirement funds to invest in Goliath and/or a related purported joint venture or partnership interest.

73. Broad Financial knew the contemplated investment and sold Plaintiff an IRA/checkbook-control structure for that investment, formed or caused the formation of an entity for the retirement account, and drafted or supplied governing documents for that entity.

74. Broad Financial's marketing to consumers includes the sale of SDIRA, IRA LLC, IRA trust, and checkbook-control services for fees.

75. Broad Financial told consumers its specialists would help them "pick the right plan for your investment."

76. Broad's "Getting Started" page said a specialist would provide an "experienced assessment of your personal situation," give an "honest opinion" about whether the planned investment would work with the platform," and "walk you through the entire process."

77. Broad Financial also represented that it would create an LLC with a "compliant operating agreement," open an IRS-compliant IRA LLC or trust, customize the documents to conform to applicable rules, and handle the paperwork.

78. Broad has described the IRA LLC facilitator's role as "crucial legal and administrative" and stated that the facilitator tailors the operating agreement to retirement-account requirements.

79. At the same time, Broad Financial published disclaimers that it does not provide legal, tax, or investment advice.

80. Plaintiff and the Class purchased Broad Financial's services because Broad Financial held itself out as possessing superior expertise concerning whether a specific contemplated investment could properly be executed through the structure Broad Financial was selling.

81. Broad Financial's services were not merely ministerial. They were marketed as investment-specific, suitability-oriented, compliance-oriented, and document-preparation services. Broad Financial's involvement served to legitimize the Goliath investment program in the eyes of investors. By directing investors to establish IRA-owned LLC structures and providing documentation represented as compliant retirement-account structures, Broad Financial created the appearance that the investment had been reviewed and structured in accordance with applicable retirement-account law.

82. Plaintiffs allege that Broad Financial's conduct was negligent, deceptive, fiduciary in nature or sufficiently trust-based to create fiduciary obligations, and in part constituted the unauthorized practice of law under New Jersey law. Ms. Presta asserts direct claims in her capacity as the IRA owner, consumer, and sole beneficial owner of all assets invested through the Presta IRA LLC. The Presta IRA LLC asserts direct claims in its capacity as the entity formed and governed by Broad Financial's services, the direct recipient of Broad Financial's legal-document preparation, and the vehicle through which Ms. Presta's retirement assets were lost.

83. Had Broad Financial told the truth, refused to prepare legal documents without licensed counsel, or disclosed that the contemplated investment was not compatible with the structure Broad Financial was selling, Plaintiff would not have paid Broad Financial's fees, would not have moved retirement funds into the Broad Financial-created structure, and would not have proceeded with the investment into the Goliath Ponzi scheme through that structure. The Presta IRA LLC likewise would not have been formed, would not have received defective governing documents, and would not have been used to channel retirement funds into Goliath.

84. As a direct and proximate result of Broad Financial's conduct, Plaintiffs and similarly situated consumers lost retirement funds, paid fees for services that were not what Broad Financial represented them to be, incurred professional and transaction costs, and suffered other monetary loss.

85. The Presta IRA LLC is a disregarded single-member LLC wholly owned by Ms. Presta's SDIRA. All assets of the Presta IRA LLC are, in economic substance and as a matter of the IRA structure Broad Financial itself marketed, the retirement assets of Ms. Presta. Any loss suffered by the Presta IRA LLC in connection with the Goliath investment constitutes a direct, personal financial loss to Ms. Presta as the IRA owner and sole beneficial holder of those

retirement funds. Ms. Presta does not assert a derivative claim on behalf of the IRA LLC; she asserts her own direct injuries, which are the same injuries suffered by the Presta IRA LLC because the Presta IRA LLC is her retirement savings vehicle—nothing more, nothing less.

86. Alternatively, and independently, the Presta IRA LLC asserts its own direct claims. The Presta IRA LLC was the direct recipient of Broad Financial's defective legal-document preparation services, including the operating agreement that Broad Financial drafted and supplied for the Presta IRA LLC's governance. The Presta IRA LLC was the entity into which Ms. Presta's retirement funds were deposited, and the Presta IRA LLC was the vehicle through which those funds were invested in the Goliath scheme. The Presta IRA LLC thus independently suffered: (a) fees charged directly to the entity at formation; (b) the loss of all assets held within it as a result of the Goliath investment; (c) the damage flowing from governance under a defective and UPL-tainted operating agreement; and (d) all consequential losses arising from the same. Together, Ms. Presta and the Presta IRA LLC have standing to assert all claims alleged herein: Ms. Presta as the individual investor and IRA owner whose retirement savings were lost, and the Presta IRA LLC as the direct contracting entity that received and was harmed by Broad Financial's services. Plaintiff's story is not unique. On information and belief, numerous individuals used the same or similar SDIRA pathways to move funds into Goliath's Ponzi scheme—often committing substantial portions of their retirement savings. Retirement money is different. It is not spare cash. It is not a speculative side account. It is the fund meant to pay for housing, medical care, food, and survival after a lifetime of work.

## VI. Federal Regulators Have Long Warned That Self-Directed IRAs Are Frequently Used in Fraud Schemes

86. The risks associated with SDIRAs being used to facilitate fraudulent investment schemes are well known and have been repeatedly highlighted by federal regulators for many years prior to the events alleged herein.

87. The SEC has issued formal public warnings explaining that SDIRAs are frequently exploited by fraud promoters to access retirement savings and to lend legitimacy to otherwise fraudulent investment schemes.

88. In its Investor Alert entitled "Self-Directed IRAs and the Risk of Fraud," the SEC warned investors that promoters of Ponzi schemes and other fraudulent investments often encourage victims to use SDIRAs to invest retirement funds in alternative assets, including private placements and cryptocurrency ventures.

89. The SEC further warned that SDIRA custodians and administrators frequently perform only ministerial functions and typically do not evaluate the legitimacy of the investments held within the account, creating an environment in which fraudulent promoters can misuse the structure to obtain retirement funds from unsuspecting investors.

90. The SEC specifically cautioned that fraudsters may attempt to create the appearance of legitimacy by directing investors to open SDIRAs and invest through specialized retirement-account structures, thereby giving the false impression that the investment has been vetted or approved by financial professionals.

91. The Financial Industry Regulatory Authority ("FINRA") has likewise issued Investor Alerts warning that SDIRAs are frequently used to facilitate fraudulent schemes involving private placements, cryptocurrency ventures, and other alternative investments.

92. In its Investor Alert entitled "Self-Directed IRAs and Fraud," FINRA warned that promoters of fraudulent investments often encourage investors to transfer retirement savings into SDIRAs so that the promoters can gain access to those funds through alternative-asset investments that are not subject to the same oversight or vetting present in traditional retirement accounts.

93. FINRA further warned that the structure of SDIRAs can create a heightened risk of fraud because investors often mistakenly believe that the existence of a custodian or facilitator implies that the investment has been evaluated for legitimacy or compliance when, in reality, no such review has occurred.

94. The Internal Revenue Service ("IRS") has also issued public warnings explaining that SDIRA structures—particularly those involving so-called "checkbook control" LLCs—present significant legal and compliance risks and have been used in abusive arrangements involving improper or unlawful transactions.

95. The IRS has warned that arrangements involving IRA-owned LLCs and checkbook-control structures can create significant risks of prohibited transactions under 26 U.S.C. § 4975, including situations where the IRA owner participates in a joint venture, partnership, or business arrangement in a manner that benefits the IRA owner personally or involves disqualified persons.

96. The IRS has specifically cautioned that IRA owners who improperly use checkbook-control structures may trigger a prohibited transaction that causes the entire IRA to lose its tax-advantaged status, resulting in immediate taxation of the full account balance and additional penalties.

97. These warnings were widely disseminated and well known within the SDIRA industry long before the events described in this Complaint.

98. Companies that market and sell SDIRA structures—including companies that form IRA-owned LLCs and promote checkbook-control arrangements—are well aware that such structures can be exploited by fraud promoters to access retirement savings.

99. Accordingly, companies operating in the SDIRA industry are expected to recognize and guard against the well-documented risk that promoters will attempt to use SDIRA structures to facilitate fraudulent investment schemes.

100. Despite these well-known risks and the repeated warnings issued by federal regulators, Broad Financial failed to implement reasonable safeguards designed to prevent its SDIRA structures from being used to facilitate fraudulent investment schemes such as the Goliath enterprise.

101. Instead, Broad Financial processed numerous Goliath-referred investors through the same SDIRA onboarding process and created IRA-owned LLC structures that were used to transfer retirement funds into the Goliath Ponzi scheme.

102. Broad Financial's conduct occurred in an industry environment in which regulators had repeatedly warned that SDIRAs were being used as conduits for fraud and that promoters frequently directed investors to use SDIRA structures to invest retirement savings in fraudulent schemes.

103. By ignoring these well-known regulatory warnings and facilitating the transfer of retirement funds into the Goliath scheme through the structures it created, Broad Financial failed to exercise reasonable care and substantially assisted the operation of the Ponzi scheme described here.

## CLASS ACTION ALLEGATIONS

104. Plaintiffs bring this action individually and on behalf of a Class of similarly situated persons pursuant to Rule 23 of the Federal Rules of Civil Procedure. For purposes of the class allegations, the term "Plaintiff" or "Plaintiffs" includes both Ms. Presta and the Presta IRA LLC, and the class definitions below is intended to encompass both the individual investor and the IRA-owned entity associated with each investor, as applicable.

105. Plaintiffs seek to represent a nationwide class defined as:

> All persons in the United States, and all IRA-owned entities formed on behalf of such persons, who established a SDIRA or IRA-owned entity through Broad Financial for the purpose of investing in Goliath Ventures or related investment programs.

108. Excluded from the class definitions are 1) Defendant and any of its current or former officers, directors, employees, agents, or representatives; 2) any judge or magistrate assigned to this action, members of their staff, and any members of their immediate families; and 3) any person or entity whose total withdrawals, redemptions, or payments from the Goliath investment program exceeded the total amount of that person or entity's invested principal (i.e., "net winners").

109. Plaintiff reserves the right to modify or amend the Class definition as discovery and further investigation may warrant.

**A. Numerosity**.

110. The members of the proposed Class are so numerous that joinder of all members is impracticable.

111. Public filings in the criminal case against Delgado and related investigative materials indicate that Goliath raised hundreds of millions of dollars from thousands of investors across multiple jurisdictions.

112. The identities of many Class members are presently known only to Defendants and third-party custodians, including financial institutions and SDIRA custodians that processed investor funds.

113. Given the substantial number of investors and the geographic dispersion of those investors, joinder of all Class members would be impracticable.

**B. Typicality**.

114. Plaintiff's claims arise from the same legal theories and operative facts as those of the Class and are therefore typical of the claims asserted on behalf of the Class. Plaintiffs and each class member invested in Goliath Ventures Joint Venture Agreements and were subject to the wrongful conduct alleged in this complaint.

115. Plaintiff and Class members suffered losses as a result of the same course of conduct by Defendant. Plaintiff's losses, like those of the Class, arise from Defendant's uniform conduct in facilitating the Goliath Ponzi scheme.

**C. Adequacy of Representation**.

116. Plaintiff will fairly and adequately represent and protect the interests of the Class.

117. Plaintiff's interests are aligned with those of the Class in seeking recovery for losses arising from the Goliath investment program. Plaintiff has no interests antagonistic to those of the Class and is not subject to any unique defenses that would impair Plaintiff's ability to represent the Class fairly and adequately. Plaintiff understands the obligations of a class representative and is prepared to fulfill those duties, including participating in discovery, appearing for deposition or trial if necessary, and acting in the best interests of the Class.

118. Proposed Class Counsel are experienced in prosecuting complex litigation, class actions, and financial fraud matters and have the resources necessary to litigate this action

vigorously through trial. Proposed Class Counsel have extensive experience investigating and prosecuting investment-related misconduct and have devoted substantial time and resources to investigating the Goliath investment scheme.

119. Indeed, prior to the arrest and indictment of Goliath's principal, Delgado, Proposed Class Counsel had already filed some of the first civil actions arising from the Goliath scheme on behalf of injured investors. Proposed Class Counsel were also the only lawyers to successfully seek the appointment of a receiver over Goliath to protect remaining assets and preserve potential recoveries for investors.

120. In addition, Proposed Class Counsel have engaged in extensive investigation of the Goliath scheme, including communications with hundreds of victims and analysis of the investment structure used to solicit investor funds. Based on that investigation, Proposed Class Counsel are organizing claims not only against the primary wrongdoers but also against third parties that enabled the scheme, including Defendant.

121. Through these efforts, Proposed Class Counsel have developed substantial knowledge concerning the Goliath enterprise, the role played by its professional advisors, and the damages suffered by investors. Proposed Class Counsel have committed and will continue to commit the resources necessary to prosecute this action and obtain the best possible recovery for the Class.

122. Accordingly, Plaintiff and Proposed Class Counsel will fairly and adequately represent and protect the interests of the Class.

**D. Commonality and Predominance.**

123. Common questions of fact and law exist as to all members of the Class and predominate over any questions pertaining to individual Class members. Among the questions common to the Class are:

a) Whether Broad Financial marketed and sold SDIRA and "checkbook control" retirement account structures for the purpose of facilitating investments in the Goliath Ventures enterprise;

b) Whether Broad Financial represented to consumers that it would evaluate their contemplated investment and assist them in selecting the appropriate retirement-account structure;

c) Whether Broad Financial prepared, supplied, or materially tailored operating agreements or other governing documents for IRA-owned entities used to invest in Goliath;

d) Whether Broad Financial's preparation of such legal documents constituted the unauthorized practice of law under New Jersey law;

e) Whether Broad Financial's conduct constituted negligence, negligent misrepresentation, breach of fiduciary duty, or violations of the New Jersey Consumer Fraud Act;

f) Whether Broad Financial knew or should have known that the structures it created were being used to channel retirement funds into the Goliath Ventures Ponzi scheme;

g) Whether Broad Financial's conduct substantially assisted the Goliath scheme by enabling investors to transfer retirement funds into that enterprise; and

h) Whether Plaintiff and members of the Class suffered damages as a result of Broad Financial's conduct, and the appropriate measure of such damages.

124. These questions are capable of common proof and will generate common answers that drive the resolution of this litigation.

125. Common questions of law and fact predominate over any questions affecting only individual Class members because Broad Financial's liability arises from a uniform course of conduct directed at investors seeking to use retirement funds to invest in Goliath Ventures. Broad Financial marketed standardized services, utilized a uniform onboarding process, and implemented materially similar entity-formation and document-preparation practices for consumers seeking to invest retirement funds through its platform.

126. As alleged herein, Broad Financial systematically marketed its purported expertise in structuring SDIRA investments, solicited information regarding consumers' intended investments, and then created or facilitated IRA-owned entities and governing documents used to channel retirement funds into the Goliath investment program. The legality of this conduct, including whether Broad Financial engaged in unauthorized legal-document preparation and whether its representations to consumers were deceptive or negligent, presents issues capable of classwide resolution.

127. Because Broad Financial's conduct was standardized and directed at investors across the United States through the same marketing representations, onboarding processes, and document-preparation practices, the claims asserted in this action can be proven through common evidence applicable to the Class as a whole. Accordingly, common questions predominate over any individualized issues.

128. New Jersey law, including the NJCFA, applies uniformly to all Class members' claims. Because all of Broad Financial's actionable conduct — its misrepresentations, its unauthorized legal-document preparation, its onboarding decisions, and its facilitation of the Goliath investment — originated from and was carried out at Broad Financial's New Jersey headquarters, New Jersey has the most significant relationship to this dispute under the Restatement (Second) of Conflicts § 148. The place of the defendant's conduct is the dominant choice-of-law factor here because Broad Financial's wrongful acts were not dispersed across jurisdictions — they were uniform, centralized, and New Jersey-sourced. The application of a single state's law to all Class members' claims eliminates any choice-of-law variation and supports a finding that common legal questions predominate over any individualized issues.

**E. Superiority**.

129. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Although each Class member paid at least thousands to dollars to invest in the relevant Goliath Joint Venture Agreements, the cost of litigation will be high. The factual issues in this case are complex and detailed, extend over several years, and relate to many transactions. Absent a class action, most members of the Class would likely find the cost of litigating their claims individually to be prohibitively high and would have no effective remedy.

130. Class treatment of common questions of law and fact is a superior method to piecemeal litigation because class treatment will conserve the resources of the courts and will promote efficiency of adjudication. Class treatment will avoid the substantial risk of inconsistent factual and legal determinations of the issues in this lawsuit.

131. All conditions precedent to this action were performed, waived or excused.

**COUNT I**
**NEGLIGENCE**

132. Plaintiffs repeat and reallege paragraphs 1 through 131 as if fully set forth herein.

133. Broad Financial owed Plaintiffs and the Class a duty to exercise reasonable care in providing the specialized, investment-specific SDIRA and checkbook-control services it marketed and sold. That duty ran to Ms. Presta as the consumer who purchased, relied upon, and paid for those services, and to the Presta IRA LLC as the entity formed, organized, and governed by Broad Financial's services and the direct recipient of the defective document preparation at issue.

134. That duty included reasonable care in evaluating whether the contemplated investment fit the structure Broad Financial was selling, in warning of material incompatibilities and compliance risks, and in refraining from legal-document preparation and investment-specific guidance it was not competent or licensed to provide.

135. Broad Financial breached those duties by, among other things: (a) representing that it would help select the right plan for the contemplated investment; (b) failing to identify, disclose, or warn that the contemplated Goliath transaction was unsuitable or incompatible with the Broad Financial structure or created serious prohibited-transaction and compliance risk; (c) preparing, supplying, or causing the preparation of legal or governing documents without proper licensure or counsel; (d) failing to advise Plaintiffs to obtain independent counsel before proceeding; (e) facilitating movement of retirement funds into the Broad Financial-created structure for the contemplated transaction; and (f) placing fee generation ahead of consumer protection and compliance.

136. It was foreseeable that consumers would rely on Broad Financial's marketed expertise and that negligent structuring or guidance could cause loss of retirement funds and related economic harm.

137. Broad Financial's negligence was a direct and proximate cause of Plaintiffs' and the Class's damages.

138. Broad Financial's negligence was not merely ordinary inadvertence but, upon information and belief, constituted gross negligence in that Broad Financial acted with reckless indifference to, and conscious disregard of, known and obvious risks that its conduct would cause the loss of Plaintiffs' retirement funds and expose Plaintiffs to severe legal, tax, and financial harm.

139. Specifically, Broad Financial knew or was generally aware that it was processing a concentrated stream of investors referred by the same promoters into the same purported investment program; knew that the contemplated transactions involved the rapid movement of retirement funds into an unregistered joint-venture structure marketed with fixed or low-risk returns inconsistent with legitimate liquidity-pool activity; knew that federal regulators had long warned that SDIRA and checkbook-control structures were frequently used to facilitate fraud; and nevertheless proceeded to form entities, prepare or supply governing documents, and facilitate the transfer of retirement funds without implementing reasonable safeguards, conducting meaningful diligence, or requiring independent legal review.

140. Broad Financial's conduct further constituted gross negligence because it consciously chose to prioritize fee generation and transaction volume over consumer protection and compliance, ignored clear and repeated red flags concerning the nature and structure of the Goliath investment program, and continued to enable the movement of retirement funds into that

program despite possessing information that would have caused a reasonable SDIRA facilitator exercising even slight care to halt or refuse to facilitate the transactions.

141. By reason of the foregoing reckless and grossly negligent conduct, Broad Financial's actions warrant the imposition of all available legal and equitable remedies, including but not limited to compensatory, consequential, and other enhanced damages permitted by law.

**COUNT II**
**NEGLIGENT MISREPRESENTATION**

142. Plaintiffs repeat and reallege paragraphs 1 through 131 as if fully set forth herein.

143. Broad Financial, in the course of its business and for the purpose of inducing consumers to purchase its services, supplied false or misleading information, including that Broad Financial would evaluate the contemplated investment, help the consumer choose the right plan, provide an informed opinion about whether the planned investment would work with the self-directed platform, and create compliant governing documents for the structure it sold.

144. Those statements were false, misleading, or materially incomplete because Broad Financial did not provide the promised investment-specific suitability analysis with reasonable care and instead sold a structure that was not the right fit for the contemplated transaction and/or created material compliance risk.

145. Broad Financial made those representations negligently, at minimum, because it failed to exercise reasonable care or competence in obtaining or communicating information to Plaintiffs and the Class.

146. Plaintiffs and the Class justifiably relied on Broad Financial's representations and omissions in purchasing Broad Financial's services, forming the Broad Financial-created entity, moving retirement funds, and proceeding with the contemplated investment. That relationship of trust extended to the Presta IRA LLC as well, which Broad Financial itself created and whose

governing documents Broad Financial drafted. This relationship placed the Presta IRA LLC in a position of inherent reliance on Broad Financial's competence and candor from the moment of its formation.

147. As a direct and proximate result, Plaintiffs and the Class suffered ascertainable and out-of-pocket losses, including Broad Financial's fees, transaction costs, professional fees, and retirement-investment losses.

**COUNT III**
**BREACH OF FIDUCIARY DUTY**

148. Plaintiffs repeat and reallege paragraphs 1 through 13 1if fully set forth herein.

149. Broad Financial cultivated and accepted a position of trust and confidence by holding itself out as possessing superior expertise about SDIRA structures, investment-specific suitability, compliance, and document preparation; by inviting consumers to disclose their planned investment; and by promising to select and implement the proper structure for that investment. Under New Jersey law, a fiduciary relationship can arise where one party places trust and confidence in another occupying a superior position and obliged to act or give advice for the other's benefit.

150. Plaintiffs and the Class reposed trust and confidence in Broad Financial with respect to whether the contemplated investment could properly be undertaken through the structure Broad Financial sold, how the entity should be formed, and what governing documents would be used.

151. Broad Financial therefore owed duties of loyalty, candor, honesty, and reasonable skill and care within the scope of that relationship.

152. Broad Financial breached those duties by steering Plaintiffs and the Class into a fee-generating structure that was not the right plan for the identified investment, by failing to disclose material incompatibilities and risks, by engaging in or directing unauthorized legal-document preparation, and by enabling the investment notwithstanding red flags and known or knowable structural defects.

153. Broad Financial's breach of fiduciary duty directly and proximately caused Plaintiffs' and the Class's losses.

## COUNT IV
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

154. Plaintiffs repeat and reallege paragraphs 1 through 131 as if fully set forth herein.

155. On information and belief, Goliath insiders, promoters, managers, soliciting agents, and/or other John/Jane Doe defendants who controlled, solicited, managed, or structured the contemplated joint-venture or partner investment owed fiduciary duties of loyalty, candor, and due care to Plaintiffs and Class members.

156. Those primary fiduciaries breached their duties by soliciting retirement-fund investments into the Goliath transaction through materially misleading statements, by concealing or failing to disclose material facts about the investment and its structure, and by inducing Plaintiffs and Class members to participate in an allegedly fraudulent or structurally improper transaction.

157. Broad Financial knew, or was generally aware, that its role was part of an overall improper scheme or tortious course of conduct because Broad Financial knew the specific contemplated investment, knew the transaction was being pitched as a joint venture or partnership interest, knew consumers were being asked to use retirement funds for that structure, and knew or

should have known that the structure Broad Financial sold was not the right fit or created material compliance risk.

158. Broad Financial consciously avoided conducting any meaningful review of the investment program despite possessing information that would have caused a reasonable professional operating in the SDIRA industry to question the legitimacy of the investment.

159. By marketing investment-specific expertise while intentionally failing to perform any reasonable and substantive diligence, Broad Financial acted with willful blindness to the obvious risk that the structure it was facilitating was being used to channel retirement funds into a fraudulent scheme using unregistered securities.

160. Broad Financial gave substantial assistance to the primary breaches by, among other things, marketing investment-specific expertise, supplying or preparing the entity and operating documents, instructing consumers how to fund the structure, facilitating movement of retirement assets into the vehicle, and lending legitimacy to the investment by packaging it as a compliant SDIRA/checkbook-control arrangement.

161. Under New Jersey law, aiding-and-abetting liability lies where a defendant knows the other's conduct is a breach of duty and gives substantial assistance or encouragement to that conduct.

162. As a direct and proximate result of Broad Financial's substantial assistance, Plaintiffs and the Class suffered damages.

**COUNT V**
**CIVIL ACTION FOR UNAUTHORIZED PRACTICE OF LAW**
**N.J.S.A. 2C:21-22a**

163. Plaintiffs repeat and reallege paragraphs 1 through 131 as if fully set forth herein.

164. Broad Financial knowingly engaged in the unauthorized practice of law by preparing, drafting, supplying, or materially tailoring operating agreements and comparable legal or governing documents for consumer IRA LLCs or trusts, and by advising consumers about the contents and use of those documents in connection with a particular contemplated investment.

165. Broad Financial's conduct went beyond merely providing ministerial, fill-in-the-blank formation filings. It included legal document preparation and investment-specific structural guidance.

166. Neither Ms. Presta nor the Presta IRA LLC received a separate attorney engagement from a licensed New Jersey lawyer through Broad Financial for the drafting of the governing entity documents. The operating agreement was drafted by Broad Financial and delivered directly to the Presta IRA LLC as its governing instrument, without the involvement of independent counsel. The Presta IRA LLC is therefore a direct victim of Broad Financial's unauthorized practice of law: it is the entity whose existence, governance, and investment activity were predicated entirely on the defective legal documents Broad Financial prepared without a license to do so.

167. Broad Financial's conduct went beyond simply handing Plaintiffs blank state forms. Broad Financial marketed document creation, structure customization, and investment-specific onboarding.

168. New Jersey Court Rule 1:21-1 provides that no person may practice law in New Jersey unless licensed. The New Jersey Unauthorized Practice of Law Committee has further stated that preparing operating agreements and similar legal documents is the practice of law and may only be performed by lawyers, while nonlawyers may not advise customers concerning the contents of formation documents.

169. New Jersey law provides that no person may practice law in the State unless licensed, that preparing operating agreements and similar legal documents is the practice of law, and that a person who suffers ascertainable loss from another's knowing unauthorized practice of law may bring a civil action for statutory and other relief.

170. Plaintiffs and the Class suffered ascertainable loss as a result of Broad Financial's unauthorized practice of law. Ms. Presta suffered ascertainable loss in the form of fees paid to Broad Financial for the services at issue, professional fees incurred in connection with the Presta IRA LLC's formation and the Goliath investment, and the loss of retirement savings that would not have been placed at risk absent Broad Financial's UPL-tainted structure. The Presta IRA LLC independently suffered ascertainable loss in the form of formation fees charged directly to it, the loss of all assets held within it, and the consequential losses flowing from having been organized and governed under documents prepared through the unauthorized practice of law. The ascertainable losses of Ms. Presta and the Presta IRA LLC are overlapping but legally distinct: Ms. Presta's loss is the loss of her retirement savings as the IRA's beneficial owner; the Presta IRA LLC's loss is the direct dissipation of its assets and the costs imposed on it by virtue of the defective governing documents it received.

171. Pursuant to N.J.S.A. 2C:21-22a, Plaintiffs and the Class seek all available legal and equitable relief, including statutory damages, treble-cost relief as provided by statute, restitution, declaratory relief, injunctive relief, attorneys' fees, and costs.

**COUNT VI**
**NEW JERSEY CONSUMER FRAUD ACT**
**N.J.S.A. 56:8-1 et seq.**

172. Plaintiffs repeat and reallege paragraphs 1 through 131 as if fully set forth herein.

173. The NJCFA applies to the claims of all Plaintiffs and Class members, regardless of their state of residence. All of Broad Financial's conduct giving rise to this Count — its affirmative misrepresentations, unconscionable commercial practices, and knowing omissions — was made from and directed out of Broad Financial's principal place of business in New Jersey. Under New Jersey's choice-of-law principles, where the wrongful conduct causing injury is entirely New Jersey-based, New Jersey's consumer protection law follows that conduct to wherever its effects are felt. Plaintiffs accordingly assert the NJCFA on behalf of the full nationwide Class.

174. Broad Financial sold services to the public for a fee, including SDIRA/checkbook-control onboarding, investment-specific intake, entity-formation services, operating-agreement or trust-document services, and related support. Those services constitute "merchandise" within the meaning of the Consumer Fraud Act.

175. Broad Financial engaged in unlawful conduct within the meaning of N.J.S.A. 56:8-2, including affirmative misrepresentations, unconscionable commercial practices, and knowing omissions of material fact, by: (a) representing that it would evaluate consumers' contemplated investments and help them select the right retirement-account structure for that specific investment when it had no intention of, and did not perform, any genuine investment-specific suitability analysis; (b) representing that it would provide an honest assessment of whether the planned investment would work with the self-directed platform when it in fact rubber-stamped Goliath-referred investors into the same structure regardless of the transaction's suitability or legality; (c) representing that it would create a "compliant" operating agreement and IRA-LLC structure when it knew, or recklessly disregarded, that the contemplated 50% partner/control joint-venture structure presented serious prohibited-transaction risk under 26 U.S.C. § 4975 and was not a permissible use of the SDIRA structure it was selling; (d) holding itself out as a "Crypto Sanctuary"

with "Alternative Asset Expertise" while lacking the competence, licensure, and independence necessary to provide the investment-specific legal and structural analysis it promised; and (e) omitting and concealing from consumers that it was operating as a referral conduit for Goliath affiliates, that it was not performing independent suitability review, that the documents it was drafting constituted the unauthorized practice of law, and that the structure it was selling was incompatible with the contemplated investment.

176. Broad Financial's unlawful conduct was a systematic, uniform course of business directed at consumers across the United States who sought to invest retirement funds through alternative-asset structures. Broad Financial processed dozens of Goliath-referred investors through the same intake process, generated the same fees, and delivered the same defective services regardless of whether the transaction was suitable, legal, or in the consumer's interest.

177. Broad Financial's conduct had the capacity to mislead reasonable consumers. The misrepresentations and omissions alleged herein were material: a reasonable consumer would consider it important to know that the company purporting to guide them to the "right plan" for their retirement investment was not performing any genuine analysis, was not licensed to prepare the legal documents it was providing, had a financial relationship with the very promoters directing investors to its platform, and was facilitating a transaction that exposed the consumer's IRA to prohibited-transaction risk and potential disqualification. Plaintiffs and the Class were in fact misled by Broad Financial's conduct and acted in reliance upon it.

178. As a direct and proximate result of Broad Financial's unlawful conduct, Plaintiffs and the Class suffered ascertainable loss within the meaning of N.J.S.A. 56:8-19, including: (a) fees paid to Broad Financial for services that were not what Broad Financial represented them to be; (b) professional and transaction costs incurred in connection with the formation of the IRA

LLC and the execution of the Goliath investment; (c) the loss of retirement savings deposited into and invested through the Broad Financial-created structure; and (d) the loss of the IRA LLC's assets, which were wholly consumed by the Goliath Ponzi scheme. These losses are quantifiable, out-of-pocket, and directly traceable to Broad Financial's misrepresentations, omissions, and unconscionable practices.

179. Broad Financial's unlawful conduct was the direct and proximate cause of Plaintiffs' and the Class's ascertainable losses. But for Broad Financial's misrepresentations and omissions, Plaintiffs would not have engaged Broad Financial's services, would not have caused the Presta IRA LLC to be formed, would not have moved retirement funds into the Broad Financial-created structure, and would not have invested those funds in the Goliath Ponzi scheme through that structure.

180. Pursuant to N.J.S.A. 56:8-19, Plaintiffs and the Class are entitled to recover treble damages, reasonable attorneys' fees, filing fees, and reasonable costs of suit.

## PRAYER FOR RELIEF

181. WHEREFORE, Plaintiffs Lucrezia Presta and Presta IRA LLC, individually and on behalf of the proposed Class, respectfully request that the Court enter judgment in their favor and grant the following relief:

A. Certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives, and appoint Plaintiffs' counsel as Class Counsel;

B. Enter judgment in favor of Plaintiffs and the Class and against Defendant on all claims asserted herein;

C. Award compensatory damages in an amount to be determined at trial for all losses suffered by Plaintiffs and members of the Class as a result of Broad Financial's wrongful conduct, including the loss of retirement savings invested through the Broad Financial-created IRA LLC structure, fees paid to Broad Financial for services that were not as represented, and all professional and transaction costs incurred in connection with the formation of the IRA LLC and the execution of the Goliath investment;

D. Award consequential damages, including damages resulting from the loss of retirement investment opportunity, the loss of the use of invested capital, and the tax and penalty consequences flowing from any disqualification of Plaintiffs' IRAs as a result of the prohibited-transaction exposure created by Broad Financial's structure;

E. Award treble damages pursuant to N.J.S.A. 56:8-19 for Broad Financial's violations of the New Jersey Consumer Fraud Act;

F. Award statutory damages and treble-cost relief pursuant to N.J.S.A. 2C:21-22a for Broad Financial's knowing unauthorized practice of law;

G. Order disgorgement and restitution of all fees, compensation, and benefits Broad Financial received in connection with the onboarding, structuring, documentation, or facilitation of investments into the Goliath enterprise, including all fees charged to Plaintiffs and Class members for entity formation, operating-agreement preparation, and related services;

H. Impose a constructive trust and order an equitable accounting for any funds, fees, or benefits wrongfully obtained by Broad Financial in connection with the Goliath enterprise;

I. Award rescission or rescissory damages to restore Plaintiffs and members of the Class to the financial position they would have occupied absent Broad Financial's misconduct;

J. Grant declaratory relief establishing that Broad Financial's preparation and supply of operating agreements and governing documents for consumer IRA LLCs constitutes the unauthorized practice of law under New Jersey law;

K. Grant injunctive relief enjoining Broad Financial from continuing to engage in the unauthorized practice of law, from making the misrepresentations and omissions alleged herein, and from facilitating the transfer of retirement funds into investment structures it has not genuinely evaluated for suitability and legal compliance;

L. Grant equitable relief as necessary to remedy Broad Financial's misconduct and to restore Plaintiffs and the Class to the financial position they would have occupied absent Broad Financial's wrongdoing;

M. Award pre-judgment and post-judgment interest as permitted by law;

N. Award Plaintiffs and the Class their reasonable attorneys' fees, litigation costs, and expenses pursuant to N.J.S.A. 56:8-19, N.J.S.A. 2C:21-22a, and any other applicable authority; and

O. Grant such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all claims so triable.

Respectfully submitted,

*s/ Adolfo Anzola, Esq.*
Adolfo Anzola, Esq. NJ Bar#030181997
Primary email: AAnzola@Sonnlaw.com
**SONN LAW GROUP PA**
19495 Biscayne Blvd Suite 607
Aventura, FL 33180
Tel 305-912-3000
Fax 786-485-1510
Primary Email: AAnzola@SonnLaw.com
Secondary Email: service@sonnlaw.com
Jeffrey R. Sonn, Esq.
Fla Bar No 773514
Jsonn@Sonnlaw.com
*(pro hac vice forthcoming)*
Brian Pastor, Esq.
Fla Bar No 998826
BPastor@Sonnlaw.com
(pro hac vice forthcoming)

**SHAW LEWENZ**
110 S.E. 6th Street, Suite 2900
Ft. Lauderdale, FL 33301
Telephone: (954) 361-3633
Facsimile: (954) 989-7781
Primary Email: jshaw@shawlewenz.com
gmorales@shawlewenz.com
Secondary Email: avazquez@shawlewenz.com
lgrealy@shawlewenz.com
JORDAN A. SHAW, ESQ.
Florida Bar No. 111771
GABRIEL E. MORALES ESQ.
Florida Bar No. 1038778
(pro hac vice forthcoming)

**ADAM A. SCHWARTZBAUM, P.A.**
Adam A. Schwartzbaum, Esq.
Fla. Bar No. 93014
14 NE 1st Ave Suite 705
Miami, FL 33132
adam@schwartzbaum.com
Secondary email:
admin@schwartzbaum.com
Tel: 786-453-8485
(pro hac vice forthcoming)

**Murphy's Law: The Crypto Law Firm**
T. Liam Murphy, Esq.
N.Y. Bar No 5853759
353 Lexington Avenue

4th Floor, Suite 400
New York, New York 10016
liam@murphyslawcrypto.com
Tel: 913-575-0540
(pro hac vice forthcoming)